## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

METHODIST HOSPITALS OF DALLAS d/b/a )
METHODIST CHARLTON MEDICAL CENTER )
3500 West Wheatland Road )
Dallas, Texas 75237 )
 )
METHODIST HOSPITALS OF DALLAS d/b/a )
METHODIST DALLAS MEDICAL CENTER )
1441 North Beckley Avenue )
Dallas, Texas 75203 )
 )
METHODIST HOSPITALS OF DALLAS d/b/a )
METHODIST RICHARDSON MEDICAL CENTER )
401 West Campbell Road )
Richardson, Texas 75080 )
 )
HENRY FORD MACOMB HOSPITAL CORPORATION )        Case No.
15855 Nineteen Mile Road )
Clinton Township, Michigan 48038 )
 )
                    Plaintiffs, )
        v. )
 )
XAVIER BECERRA, Secretary, )
United States Department of )
Health and Human Services, )
200 Independence Avenue S.W. )
Washington, D.C. 20201, )
 )
                    Defendant. )
_____ )

## COMPLAINT FOR JUDICIAL REVIEW AND DECLARATORY
## AND INJUNCTIVE RELIEF UNDER THE MEDICARE ACT

### NATURE OF ACTION

1.      This case concerns the proper treatment in the calculation of the Medicare Part A

disproportionate share hospital ("DSH") payment of inpatient hospital days for patients who were

enrolled in Medicare Advantage plans under Part C of the Medicare Act.  The Court of Appeals

has now ruled against the agency in three actions challenging the agency's repeated attempts to

apply its Part C days policy change first adopted in 2004 to deny Medicare DSH payments to hospitals. *See Northeast Hosp. Corp. v. Sebelius*, 657 F.3d 1, 16–17 (D.C. Cir. 2011) (finding application of the 2004 rule to prior periods impermissibly retroactive); *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1105 (D.C. Cir. 2014) ("*Allina I*") (vacating the 2004 rule because it was not a logical outgrowth of the proposed rule); *Allina Health Servs. v. Price*, 863 F.3d 937, 943–44 (D.C. Cir. 2017), *aff'd sub nom. Azar v. Allina Health Servs.*, 139 S. Ct. 1804 (2019) ("*Allina II*") (holding that the agency must undertake notice-and-comment rulemaking before the policy of the 2004 vacated rule can take effect). But the agency refuses to acquiesce in those decisions or in the Supreme Court's recent decision in *Allina II* affirming the Court of Appeals' decision. *Allina II*, 139 S. Ct. 1804. Instead, the agency has continued to apply the Part C days policy adopted in the now-vacated 2004 rule in violation of these decisions, including in the payment determinations at issue for the plaintiff hospitals in this case, in a recently issued proposed rule seeking to re-adopt the same 2004 policy retroactively, and in a ruling that would leave undisturbed the payment determinations from which hospitals have appealed and, as construed by the agency's administrative Board, not permit further administrative or judicial review of those determinations. The agency's continued attempts to apply the 2004 policy should be rejected because they are procedurally invalid, as the Court of Appeals has now twice ruled, fail any test of reasoned decision-making, and are inconsistent with congressional intent in adopting the Medicare DSH statute.

## JURISDICTION AND VENUE

2.      This action arises under the Medicare Act, Title XVIII of the Social Security Act, 42 U.S.C. § 1395 et seq.

3.      Jurisdiction is proper under 42 U.S.C. § 1395oo(f)(l) and 28 U.S.C. § 1331.

4.      Venue is proper in this judicial district under 42 U.S.C. § 1395oo(f)(l).

2

## PARTIES

5.      The plaintiff hospitals in this action and hospital fiscal years (or portions thereof)

at issue are as follows:

(1)      Henry Ford Macomb Hospital Corporation, Provider No. 23-0047, fiscal year
         ending December 31, 2013;

(2)      Methodist Hospitals of Dallas d/b/a Methodist Charlton Medical Center, Provider
         No. 45-0723, fiscal year ending June 30, 2008;

(3)      Methodist Hospitals of Dallas d/b/a Methodist Dallas Medical Center, Provider No.
         45-0051, fiscal year ending June 30, 2008; and

(4)      Methodist Hospitals of Dallas d/b/a Methodist Richardson Medical Center,
         Provider No. 45-0537, fiscal year ending June 30, 2014.

6.      The defendant is Xavier Becerra, in his official capacity as Secretary of the United

States Department of Health and Human Services ("Secretary"), the federal agency that

administers the Medicare program.  References to the Secretary herein are meant to refer to him,

to his subordinates, and to his official predecessors or successors as the context requires.

7.      The Centers for Medicare & Medicaid Services ("CMS") is the component of the

Secretary's agency with responsibility for day-to-day operation and administration of the Medicare

program.  CMS was formerly known as the Health Care Financing Administration.  References to

CMS herein are meant to refer to the agency and its predecessors.

## LEGAL AND REGULATORY BACKGROUND

### Medicare Payment Determinations and Appeals

8.      Part A of the Medicare Act covers "inpatient hospital services." 42 U.S.C.

§ 1395d(a)(l).  Since 1983, the Medicare program has paid most hospitals for the operating costs

of inpatient hospital services under the prospective payment system ("PPS").   42 U.S.C.

§ 1395ww(d); 42 C.F.R. Part 412.   Under PPS, Medicare pays predetermined, standardized

amounts per discharge, subject to certain payment adjustments.  *Id.*  One of the PPS payment adjustments is the DSH payment.  *See* 42 U.S.C. § 1395ww(d)(5)(F); 42 C.F.R. § 412.106.

9.      After the close of each fiscal year, a hospital is required to file a "cost report" with a Medicare Administrative Contractor designated by the agency.  42 C.F.R. §§ 413.20, 413.24.

10.     The Medicare Administrative Contractor analyzes a hospital's cost report and issues a year-end determination, called a Notice of Program Reimbursement ("NPR"), as to the amount of Medicare program reimbursement due the hospital for services furnished to Medicare patients during the fiscal year covered by the cost report.  *See* 42 C.F.R. § 405.1803; *see also In re Medicare Reimbursement Litig.*, 309 F. Supp. 2d 89, 92 (D.D.C. 2004), *aff'd*, 414 F.3d 7 (D.C. Cir. 2005).

11.     A hospital may appeal a Medicare Administrative Contractor's determination as to the total amount of Medicare program reimbursement due the hospital for the fiscal year covered by a cost report to the agency's Provider Reimbursement Review Board ("Board").  *See* 42 U.S.C. § 1395oo(a)(1)(A); 42 C.F.R. §§ 405.1835–405.1877.

12.     A hospital has the right to a hearing before the Board if it is dissatisfied with the contractor's payment determination in an NPR as to the total amount of program reimbursement due to the hospital for its cost reporting period.  42 U.S.C. § 1395oo(a)(1); *see also* 42 C.F.R. §§ 405.1835; 405.1837.  The statute further requires a minimum amount in controversy and that the appeal be filed timely.  42 U.S.C. § 1395oo(a).

13.     The Board's regulations at 42 C.F.R. § 405.1801(d)(2) provide that in computing deadlines for appeals, days where the Board is "unable to conduct business in the usual manner due to extraordinary circumstances beyond its control" are not included in the calculation of

deadlines.  The regulation instead provides that the clock on a deadline resumes when the Board is "able to conduct business in the usual manner."  *Id.*

14.     In response to the COVID-19 public health emergency, the Board published "Alert 19."[1]  This Alert states that the Board is "maximizing telework" due to COVID-19, but further states that the Board is "continuing to operate in the most efficient manner possible."  Nonetheless, in this Alert, the Board states that it is temporarily suspending all appeal deadlines set by the Board, invoking 42 C.F.R § 405.1801(d) for the authority to do so.  Alert 19 ¶ 2.  The Board also makes clear in the Alert, however, that the suspended deadlines do not include the "deadlines established by statute or CMS regulations."  *Id.* ¶ 2 n.1.

## Expedited Judicial Review

15.     The Medicare statute authorizes the Board to determine that it is without authority to decide a question of law or regulations relevant to a matter in controversy in an appeal before the Board and to grant the right to expedited judicial review ("EJR").  42 U.S.C. § 1395oo(f)(1).  Pursuant to the Secretary's regulations, the Board is bound by agency rules and rulings, like the 2004 rule at issue.  42 C.F.R. § 405.1867.  Accordingly, the statute allows a hospital to request a Board determination as to its authority to decide a question of law or regulations and to initiate an action in this Court if the Board determines that EJR is appropriate or fails to make a determination as to its authority within 30 days after receipt of a request for such a determination.  *See* 42 U.S.C. § 1395oo(f)(1); *Clarian Health W., LLC v. Hargan*, 878 F.3d 346, 354 (D.C. Cir. 2017) ("The expedited judicial review provision makes it clear that 'if the Board fails to render [a] determination' on its authority within 30 days, 'the provider may bring a civil action . . . with

[1] *Available at* https://www.cms.gov/Regulations-and-Guidance/Review-Boards/PRRBReview/PRRB-Alerts.

5

respect to the matter in controversy contained in such request for a hearing.'"); *Allina II*, 863 F.3d at 941 ("A provider may bring suit in the district court even when the Board fails to make a timely determination of its authority to decide a case."); *accord Methodist Hosp. of Memphis v. Sullivan*, 799 F. Supp. 1210, 1216 (D.D.C. 1992), *rev'd on other grounds, Adm'rs of Tulane Educ. Fund v. Shalala*, 987 F.2d 790 (D.C. Cir. 1993).

16.     The regulation implementing the EJR statute, 42 C.F.R. § 405.1842(f), sets forth an additional requirement for granting EJR, not found in the statute, that the Board have "jurisdiction to conduct a hearing on the specific matter at issue."  When presented with a request for EJR, the regulations require that the Board "make a preliminary determination of the scope of its jurisdiction (that is, whether the hearing request was timely, and whether the amount in controversy has been met)."  *Id.* § 405.1840(a)(2).  The regulation does not create any further conditions beyond those in the statute to establish jurisdiction for a Board appeal.  *See* 42 C.F.R. §§ 405.1835, 405.1837.  Under the EJR regulations, only after finding that the statutory requirements for jurisdiction have been met, as set forth in 42 C.F.R. § 405.1840(a)(2), does the Board then proceed to determine if it has the authority to decide a legal question relevant to a matter at issue.  *Id.* § 405.1842(e)(1).

## Medicare DSH Payment

17.     A hospital that serves a disproportionate share of low-income patients is entitled to an upward percentage adjustment to the standard PPS rates per discharge.  *See* 42 U.S.C. § 1395ww(d)(5)(F); *see also* 42 C.F.R. § 412.106.  A hospital may qualify for a DSH adjustment based on its "disproportionate patient percentage."  *See* 42 U.S.C. §§ 1395ww(d)(5)(F)(i)(I) and (d)(5)(F)(v); 42 C.F.R. § 412.106(c)(1).  The disproportionate patient percentage determines both a hospital's qualification for the DSH payment and the amount of the payment.  *See* 42 U.S.C. §§ 1395ww(d)(5)(F)(iv) and (vii)–(xiii); 42 C.F.R. § 412.106(d).  The disproportionate patient

percentage is defined as the sum of two fractions expressed as percentages.   42 U.S.C. § 1395ww(d)(5)(F)(vi).

18.     The first fraction that is used to compute the DSH payment is commonly known as the "Medicaid fraction."  The statute defines the Medicaid fraction as:

> the fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under [the Medicaid statute, title XIX of the Social Security Act], but who were *not entitled to benefits under part A* of [the Medicare statute, title XVIII of the Social Security Act], and the denominator of which is the total number of the hospital's patient days for such period.

42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (emphasis added).  As reflected in the italicized language above, the numerator of the Medicaid fraction consists of days for patients who were both eligible for medical assistance under the Medicaid statute and "not entitled to benefits under part A" of the Medicare statute.

19.     The other fraction that is used to compute the DSH payment is the "Medicare part A/SSI fraction" or "SSI fraction."  The statute defines this fraction as:

> the fraction (expressed as a percentage), the numerator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were *entitled to benefits under part A* of [the Medicare statute] and were entitled to supplemental security income benefits (excluding any State supplementation) . . . , and the denominator of which is the number of such hospital's patient days for such fiscal year which were made up of patients who (for such days) were *entitled to benefits under part A* of [the Medicare statute] . . . .

42 U.S.C. § 1395ww(d)(5)(F)(vi)(I) (emphases added).  As the italicized language indicates, the Medicare Part A/SSI fraction consists solely of days for patients who were "entitled to benefits under part A" of Medicare.  The denominator includes all Medicare Part A days, whereas the numerator includes only those Part A days for patients who are also entitled to social security income ("SSI") benefits under title XVI of the Social Security Act.  The Medicare Part A/SSI fraction is computed for each federal fiscal year ("FFY") by the agency, and must be used to

compute a hospital's DSH payment for the cost reporting period beginning in the federal fiscal year.  42 C.F.R. §§ 412.106(b)(2)–(3).  A hospital may elect to have the Medicare Part A/SSI fraction recalculated based on patient days in its own cost reporting period instead of the federal fiscal year.  *See id.*; *see also* 42 U.S.C. § 1395ww(d)(5)(F)(vi), (vi)(I) (requiring calculation of Medicare Part A/SSI fraction based on the cost reporting period); 51 Fed. Reg. 16,772, 16,777 (May 6, 1986) (stating that while the agency would rely on the federal fiscal year, it was "affording all hospitals the option to determine their number of patient days of those dually entitled to Medicare Part A and SSI for their own cost reporting periods").

### Medicare Part C

20.     Section 4001 of the Balanced Budget Act of 1997, Pub. Law No. 105-33, added a new Part C to the Medicare statute to establish a Medicare program that was originally called the Medicare+Choice (also known as "M+C") program and is now called Medicare Advantage.  A Medicare beneficiary can elect to receive Medicare benefits either through the original fee-for-service program under Medicare Parts A and B, or through enrollment in a Medicare Advantage plan under Medicare Part C.  42 U.S.C. § 1395w-21(a)(1); 42 C.F.R. § 422.50; *see also* 63 Fed. Reg. 34,968, 34,968 (June 26, 1998) ("Under section 1851(a)(1), every individual entitled to Medicare Part A and enrolled under Part B . . . may elect to receive benefits through *either* the existing Medicare fee-for-service program or a Part C M+C plan.") (emphasis added).

21.     "Before 2004, [Defendant's agency] had *not* treated Part C enrollees as 'entitled to benefits under Part A.'"  *Allina II*, 863 F.3d at 939 (quoting *Northeast Hosp.*, 657 F.3d at 15); *see also Allina I*, 746 F.3d at 1106 ("Prior to 2003, the Secretary treated Part C patients as not entitled to benefits under Part A."); *Allina I*, 904 F. Supp. 2d at 78–80; *Northeast Hosp.*, 657 F.3d at 16–17.  The DSH regulation prior to 2004 limited part-A-entitled days in the Medicare Part A/SSI fraction to patient days that were "covered," or paid, by Medicare Part A.  *See* 42 C.F.R.

8

§ 412.106(b)(2)(i) (2003); 42 C.F.R. § 409.3 (defining "covered" as services for which payment is authorized). The agency said as much when adopting the pre-2004 regulation, explaining that the numerator of the Medicare Part A/SSI fraction included only "*covered* Medicare Part A inpatient days." 51 Fed. Reg. 16,772, 16,777 (May 6, 1986) (emphasis added); *see also* 51 Fed. Reg. 31,454, 31,460–61; *Catholic Health Initiatives-Iowa Corp. v. Sebelius*, 718 F.3d 914, 921 n.5 (D.C. Cir. 2013) (noting that the pre-2004 regulation limited the Medicare Part A/SSI fraction to "covered Medicare Part A inpatient days") (citing 51 Fed. Reg. at 16,777). Accordingly, the DSH regulation prior to 2004 necessarily excluded Part C days from Part-A-entitled days because Part C days are not covered or paid under Part A. *See* 42 U.S.C. § 1395w-21(a)(1), (i) (providing that payment of Part C benefits is in lieu of benefits otherwise payable under Part A); *see also Northeast Hosp*., 657 F.3d at 6.

22. Further, written guidance prior to 2004 repeatedly expressed the agency's policy that Part C days, as days for which patients were not entitled to Part A payment, were to be excluded from the Medicare Part A/SSI fraction. *See Northeast Hosp.*, 657 F.3d at 15 (describing prior instructions not to submit information related to services furnished to Part C patients that would have been necessary to count Part C days in the Medicare Part A/SSI fraction). This guidance included instructions to hospitals and program memoranda transmitting the Medicare Part A/SSI fractions on an annual basis. *See* HCFA Pub. 60A, Transmittal No. A-98-36 (Oct. 1, 1998), *reprinted in* MEDICARE & MEDICAID GUIDE (CCH) ¶ 150,103 (transmitting Medicare Part A/SSI fractions that excluded Part C days, specifying that the fractions include only "covered Medicare days," and referring to the ratio of SSI days and "covered Medicare days" as "the ratio of Medicare Part A patient days attributable to SSI recipients"); HCFA Pub. 60A, Transmittal No. A-99-42 (Sept. 1, 1999), *reprinted in id.* ¶ 150,769 (same); HCFA Pub. 60A, Transmittal No. A-

00-54 (Aug. 17, 2000), *reprinted in id.* ¶ 151,363 (same); CMS Pub. 60A, Transmittal No. A-01-109 (Sept. 13, 2001), *reprinted in id.* ¶ 152,216 (same); CMS Pub. 60A, Transmittal No. A-02-086 (Sept. 11, 2002), *reprinted in id.* ¶ 152,922 (same); CMS Pub. 60A, Transmittal No. A-03-067 (Aug. 8, 2003), *reprinted in id.* ¶ 153,554 (same); CMS Pub. 100-04, Transmittal 275 (Aug. 13, 2004), *reprinted in id.* ¶ 154,468 (same).

23.     In a 2003 proposed rule, the agency proposed "to clarify" its long-held position that "once a beneficiary elects Medicare Part C, those patient days attributable to the beneficiary should not be included in the Medicare fraction of the DSH patient percentage." 68 Fed. Reg. 27,154, 27,208 (May 19, 2003). Further, the agency explained that "[t]hese days should be included in the count of total patient days in the Medicaid fraction (the denominator), and the patient's days for a [Part C] beneficiary who is also eligible for Medicaid would be included in the numerator of the Medicaid fraction." *Id*. The agency explained that "once a beneficiary has elected to join a Medicare Advantage plan, that beneficiary's benefits are no longer administered under Part A." *Id.*

24.     In a final rule published in August 2004, however, the agency engaged in a "volte-face" and "abruptly announced a change in policy." *Allina I*, 904 F. Supp. 2d 75, 78 (D.D.C. 2012); *Allina I*, 746 F.3d at 1107–10. That 2004 rule announced that the agency would "adopt a policy" to include Part C days in the Medicare Part A/SSI fraction and exclude them from the Medicaid fraction effective October 1, 2004. 69 Fed. Reg. 48,916, 49,099 (Aug. 11, 2004); *see also Northeast Hosp.*, 657 F.3d at 16 ("[I]n the 2004 rulemaking [the agency] announced that [it] was 'adopting a policy' of counting [Part C] days in the Medicare fraction.").

25.     In the 2004 final rule, the agency amended the regulation text by deleting the word "covered." 69 Fed. Reg. at 49,246. When the agency initially transmitted the Medicare Part A/SSI

fractions for FFYs 2005 and 2006, however, those fractions continued to exclude Part C days.  *See* CMS Pub. 100-04, Transmittal 1091 (Oct. 27, 2006), *reprinted in* MEDICARE & MEDICAID GUIDE (CCH) ¶ 156,277 (transmitting FFY 2005 Medicare Part A/SSI fractions and specifying that the fractions include only "covered Medicare days," and referring to the ratio of SSI days and "covered Medicare days" as "the ratio of Medicare Part A patient days attributable to SSI recipients"); CMS Pub. 100-04, Transmittal 1396 (Dec. 14, 2007), *reprinted in id*. ¶ 156,930 (same for FFY 2006 fractions).

26.     In July 2007, the agency issued a revision to a Medicare program manual, with a "purported 'effective date' of October 1, 2006," that permitted hospitals to submit the data necessary to implement the new policy regarding Part C days.  *Allina I*, 904 F. Supp. 2d at 82. Thereafter, in August 2007, the agency further amended the text of the DSH regulation governing Part C days without affording hospitals prior notice or opportunity for comment.  72 Fed. Reg. 47,130, 47,384 (Aug. 22, 2007).  Following the amendments in 2004 and 2007, the regulation provided that the Medicare Part A/SSI fraction includes all patient days (not just "covered" days) for "patients entitled to Medicare Part A (*or Medicare Advantage (Part C)*)."  *Id*. at 47,411 (amending §§ 412.106(b)(2)(i)(B) and (iii)(B)) (emphasis added).  The amendment of the regulation was made effective October 1, 2007, the beginning of FFY 2008. *Id.* at 47,130; *see also Allina I*, 904 F. Supp. 2d at 82.  The agency further amended the regulation "in 2010 to use the word 'including' in place of 'or,' in an apparent attempt to bolster further" the agency's position on the treatment of Part C days.  *Allina I*, 904 F. Supp. 2d at 82 n.5.

### *Northeast Hospital*

27.     The agency's change to the DSH payment calculation first adopted in 2004 has given rise to substantial litigation that continues to this day.  Initially, the agency attempted to

11

apply the 2004 rule change retroactively to cost years prior to the October 1, 2004 effective date

of the 2004 rule.  The Court of Appeals found that the agency's retroactive application of its current

rule to periods prior to October 1, 2004 violated the Supreme Court's longstanding decision in

*Bowen v. Georgetown University Hospital*, 488 U.S. 204, 208 (1988).  *See Northeast Hosp.*, 657

F.3d at 16.  The Court held that "the Secretary's present interpretation, which marks a substantive

departure from his prior practice of excluding [Part C] days from the Medicare fraction, may not

be retroactively applied" to the fiscal years at issue.  *Id.* at 17.

28.     Following the D.C. Circuit's decision, the Secretary issued TDL-12391, which

stated that in light of the *Northeast* decision, the agency was instructing its contractors to "include

any disallowed patient days attributable to patients who were enrolled in a Medicare Part C Plan

and also eligible for Medicaid for discharges occurring on or after January 1, 1999 through

September 30, 2004 in the Medicaid fraction" of the DSH calculation.  This instruction specified

this relief should be applied to any cost reports that were not yet settled, as well as settled cost

reports where the Provider had filed a proper appeal.  *Id*. at 1–2.

### The *Allina I* Litigation

29.     In July 2009, the agency first published Medicare Part A/SSI fractions for hospital

cost reporting periods beginning in FFY 2007.[2]  These fractions for the first time included Part C

days.

30.     In *Allina I*, a group of hospitals challenged the 2004 rule change through

administrative appeals initiated in 2009, arguing (1) that the new Part C days policy was not the

"logical outgrowth" of the 2003 proposed rule "clarifying" the agency's former policy, and (2) that

---

[2] The agency did not even begin to collect "all the data necessary to implement its new policy
until 2007," and the FFYs 2005 and 2006 Medicare Part A/SSI fractions did not include Part C
days.  *Allina I*, 904 F. Supp. 2d at 81–82.

the rule was arbitrary and capricious because the agency's "cursory explanation in the 2004 Final Rule" failed to acknowledge its departure from past policy and practice and ignored the "financial impact" of that departure. *Allina I*, 904 F. Supp. 2d at 89, 83, 92–94.

31.     This Court agreed and held that the policy announced in the 2004 final rule regarding Part C days was not the logical outgrowth of the 2003 proposed rule. *Id.* at 89–92. This Court also held that the "cursory explanation in the 2004 Final Rule failed to meet the requirements of the APA" because "the Secretary[] fail[ed] to acknowledge her 'about-face,'" and "her reasoning for the change was brief and unconvincing." *Id.* at 93 (quoting *Northeast Hosp.*, 657 F.3d at 15). Accordingly, this Court concluded that "[t]he portion of the 2004 Final Rule . . . that announced the Secretary's interpretation of the Medicare Disproportionate Share Hospital Fraction, as codified in 2007 at 42 C.F.R. § 412.106(b)(2) and as further modified in 2010, will be vacated, and the case will be remanded to the Secretary for further action consistent with this Opinion." *Id.* at 95.

32.     While the agency's appeal from this Court's decision in *Allina I* was pending before the Court of Appeals, the agency engaged in a new rulemaking on the treatment of Part C days effective only prospectively, beginning October 1, 2013. In that rulemaking, the agency "in an abundance of caution . . . proposed to readopt the policy of counting the days of patients enrolled in [Part C] plans in the Medicare fraction . . . ." 78 Fed. Reg. 50,496, 50,615 (Aug. 19, 2013). Accordingly, effective as of October 1, 2013, the rule governing the DSH calculation is the same as the 2004 rule had been. *See id.* at 50,619 (rule "readopt[ion]" applies to "FY 2014 and subsequent years" only).

33.     On April 1, 2014, the Court of Appeals affirmed this Court's *Allina I* decision on the merits, "agree[ing] with the district court that the Secretary's final rule was not a logical

outgrowth of the proposed rule." 746 F.3d at 1109. The Court explained that "a party reviewing the Secretary's notice of proposed rulemaking understandably would have assumed that the Secretary was proposing to 'clarify' a then-existing policy, i.e., one of excluding Part C days from the Medicare fraction and including them in the Medicaid fraction." *Id.* at 1108. Because this procedural failure was a sufficient basis to vacate the rule, the Court of Appeals did not reach the arbitrariness of the agency's explanation. *Id.* at 1111.

34.     With respect to remedy, the Court of Appeals held that this Court "correctly concluded that vacatur was warranted." *Id.* The court reversed, however, a part of this Court's order that required "the Secretary to recalculate the hospitals' reimbursements 'without using the interpretation set forth in the 2004 Final Rule.'" *Id.* (quoting the Post-Judgment Order). The Court of Appeals instead remanded, noting that the "question whether the Secretary could reach the same result" on remand as would have applied under the vacated rule "was not before the district court" and therefore this Court should have simply "remand[ed] after identifying the error." *Id.* at 1111.

### The *Allina II* Litigation

35.     In mid-June 2014, sixteen days after the Court of Appeals' mandate in *Allina I* vacating the 2004 rule, the agency published Medicare Part A/SSI fractions for FFY 2012, including Part C days for all hospitals in the country. The agency proceeded without notice or comment opportunity and provided no explanation at all for its decision to include Part C days in the Medicare Part A/SSI fractions for FFY 2012 but instead issued those fractions just as it had for prior years, as if the vacatur of that rule in *Allina I* had never happened. Certain plaintiff hospitals in the *Allina I* litigation filed a separate action in this Court challenging the 2014 determination. The agency moved to dismiss the action, asserting that the Board incorrectly granted EJR in that case, but this Court rejected that motion. This Court then granted the agency's motion for summary judgment. *Allina II*, 201 F. Supp. 3d 94 (D.D.C. 2016), which the hospitals appealed.

14

36.    In 2017, the Court of Appeals unanimously reversed the District Court, agreeing with the hospitals that the agency "violated the Medicare Act by failing to provide for notice and comment" before readopting the 2004 policy. *Allina II*, 863 F.3d at 942.  The Court of Appeals concluded that the Medicare Act, 42 U.S.C. § 1395hh(a)(2), required rulemaking for any "(1) 'rule, requirement, or other statement of policy' that (2) 'establishes or changes' (3) a 'substantive legal standard' that (4) governs 'payment for services," and that the agency's issuance of the FFY 2012 Medicare Part A/SSI fractions including Part C days satisfied each of these factors. *Id.* at 945. The court also found that the agency violated another provision of the Medicare Act, 42 U.S.C. § 1395hh(a)(4), which provides that "if a regulation includes 'a provision that is not a logical outgrowth of a previously published notice of proposed rulemaking,' that provision may not become legally operative until it has gone through notice-and-comment rulemaking." *Id.* at 945.

37.    The Court of Appeals also ruled on the Board's EJR authority in *Allina II*.  Pertinent here, the Court of Appeals ruled that the Medicare "statute conditions expedited judicial review in the district court on the existence of [a] no-authority determination, *not* on whether that determination is correct," and the Court explained that a hospital "may bring suit in the district court even when the Board fails to make a timely determination of its authority to decide a case." *Allina II*, 863 F.3d at 941.

38.    On June 3, 2019, the Supreme Court affirmed the Court of Appeals' ruling in *Allina II* as to the notice-and-comment requirement under 42 U.S.C. § 1395hh(a)(2). *Allina II*, 139 S. Ct. 1804.  The Supreme Court held that the agency's 2014 application of the 2004 Part C days policy required notice-and-comment rulemaking under section 1395hh(a)(2) of the Medicare statute. *Id.* at 1810–14.  In addition, the Supreme Court's decision did not disturb the Court of Appeals' ruling

that the readopted 2004 policy is invalid under 42 U.S.C. § 1395hh(a)(4) because the agency failed to engage in notice-and-comment rulemaking.  *Id.* at 1816.

39.     On September 4, 2019, this Court entered judgment in favor of the plaintiffs in *Allina II*.  *See* Order, *Allina II*, Case No. 14-cv-1415 (D.D.C. Sept. 4, 2019), ECF No. 58.  As part of its order, the District Court vacated the agency's 2014 publication of the FFY 2012 Medicare Part A/SSI fractions including Part C days.  *Id.* at 2.  On September 4, 2020, the plaintiffs in that case filed a motion to enforce the Court's earlier judgment, citing the agency's continued application of the 2012 Medicare Part A/SSI fractions, as well as the proposed rule and CMS Ruling 1739-R, as evidence of non-compliance with the order.  *See* Mot. Enforce J., *Allina II*, Case No. 14-cv-1415 (D.D.C. Sept. 4, 2020), ECF No. 60.  That motion is currently pending in *Allina II.*

### Agency's Proposed Retroactive Rule and CMS Ruling 1739-R

40.     On August 6, 2020, nearly a year after this Court entered judgment in the *Allina II* plaintiffs' favor, the agency published in the Federal Register a notice of proposed rulemaking announcing a proposal to adopt retroactively for periods prior to October 1, 2013 (and even prior to the vacated 2004 rule) the same Part C policy change as that previously adopted in the publications vacated in *Allina I* and *Allina II*.  85 Fed. Reg. 47,723.

41.     The proposed rule claims that, due to the vacatur of the 2004 rule, the agency has no rule governing the treatment of Part C days and must, under the Supreme Court opinion requiring notice-and-comment rulemaking, engage in retroactive rulemaking.  *Id.* at 47,724–25. The proposed rule, however, ignores the pre-2004 rule that still governs the treatment of Part C days in the DSH payment following the 2004 rule's vacatur.  *Id.* at 47,725.  The proposed rule claims two grounds for its use of retroactive rulemaking:  first, that retroactive rulemaking is

necessary to comply with the statutory requirement to calculate Medicare DSH payments, and second, that retroactive rulemaking is in the "public interest" because, absent retroactive rulemaking, the agency "would be unable to calculate and confirm proper DSH payments for the time periods before FY 2014 . . . ." *Id.*

42.     Shortly after issuing the proposed rule, the agency also issued CMS Ruling 1739-R ("Ruling"), dated August 17, 2020, purporting to deprive the Board of jurisdiction over any pending administrative appeals "regarding the treatment of patient days associated with patients enrolled in [Part C] Medicare Advantage plans in the Medicare and Medicaid fractions of the disproportionate patient percentage" so that contractors can apply the result of the retroactive rulemaking to those pending appeals once the new rule is in place.  Ruling at 1–2.[3]  The Ruling addresses appeals of the "Part C day DSH issue" for periods prior to October 1, 2013, including for periods prior to the enactment of the 2004 rule.  *Id.* at 7–8.

43.     Before taking any action on an appeal, the Ruling requires the Board to determine whether an appeal "satisfies the applicable jurisdictional and procedural requirements of section 1878 of the [Medicare] Act, the Medicare regulations, and other agency rules and guidance."  *Id.* at 7.  The Ruling generally provides for remand of jurisdictionally proper appeals of the "Part C day DSH issue" pending at the Board back to the contractors that issued the payment determinations under appeal.  *Id.* at 2, 7–8.  Despite affording hospitals the opposite of the relief that they are requesting, and that the proposed rule has not been finalized, the Ruling claims that the proposed rule "eliminates any actual case or controversy regarding the hospital's previously calculated SSI and Medicaid fractions and its DSH payment adjustment and thereby renders moot

---

[3] *Available at*  https://www.cms.gov/regulations-and-guidanceguidancerulingscms-rulings/cms-1739-r.

each properly pending claim in a DSH appeal involving the issue resolved by the Supreme Court in *Allina* . . . ." *Id.* at 8. While the Ruling explains that there have been frequent requests for EJR on the Part C day DSH issue, *id.* at 6, the Ruling nowhere directs the Board not to rule, as required by statute, on hospital requests for determinations as to whether the Board lacks authority to decide a legal question within 30 days. The Ruling, which is "binding" and affects hospitals' substantive Medicare payment and appeal rights, was not adopted through notice-and-comment rulemaking. *See id.* at 1; *see also* 42 C.F.R. § 405.1867 (requiring the Board to comply with CMS rulings); *id.* § 401.108 (defining CMS ruling and explaining that they are binding on agency adjudicators).

44.     Following publication of the Ruling, the agency issued a further nonbinding (and unpublished) instruction to its contractors known as a "Technical Direction Letter" or "TDL," suggesting that hospitals would receive revised payment determinations even if their Medicare DSH payments did not change after the final rule on Part C days is ultimately published, and that hospitals would be able to appeal any revised payment determinations issued applying the final rule. However, that instruction is not binding on the agency and can be rescinded at any time. Moreover, neither the agency's recent Ruling nor its clarifying instruction guarantees hospitals appeal rights following remand or requires the Board to find jurisdiction over hospital appeals of the Part C days issue after recalculation. *See* Ruling at 8–9.

45.     Since publication of the Ruling, the Board has invoked the Ruling to remand to the Medicare contractors a number of appeals challenging the application of the 2004 policy change. These remand decisions from the Board construing the Ruling generally state that the Board has reviewed jurisdictional materials in the Board's records, and that while the Board has jurisdiction over the appeal, it must remand the appeals under the terms of the Ruling. At the same time that the Board has continued reviewing jurisdiction for purposes of remanding hospitals' cases under

the Ruling, however, the Board has also repeatedly taken the position that it cannot rule on requests for EJR due to the Board's lack of access to its hard-copy case files containing documentation needed to determine jurisdiction due to the COVID-19 pandemic. In yet other cases, the Board has claimed that it lacks jurisdiction under the Ruling to rule at all on requests for EJR, and thus cannot determine its authority to decide the legal question presented in the appeal.

## FACTS SPECIFIC TO THIS CASE

46.     Each of the plaintiff hospitals timely filed an appeal to the Board expressing its dissatisfaction with the treatment of Part C days in the calculation of the DSH payment and contesting the determination of the DSH payment amount due for its cost years at issue on the ground that Part C days were incorrectly counted in the Medicare DSH calculation. The Board assigned those cases numbers 13-1937GC, 18-1406GC, 21-0284GC, and 21-0285GC.

47.     The plaintiff hospitals in Board cases 13-1937GC and 18-1406GC submitted through the Board's electronic filing system requests that the Board grant EJR of the agency's continued application of the Part C days policy from the vacated 2004 rule despite the holdings in the *Allina I* and *Allina II* decisions.

48.     By letter dated October 27, 2021, the Board responded to the EJR requests of the plaintiff hospitals in Board cases 13-1937GC and 18-1406GC. *See* Exhibit A. In its letter, the Board found that it had jurisdiction to hear the plaintiff hospitals' appeals in these cases under 42 C.F.R. § 405.1835(a). Exhibit A at 12–13. The Board concluded that it had jurisdiction with respect to the Ruling's mandate that the Board remand otherwise jurisdictionally valid appeals, but that it "lack[ed] the authority to decide the challenge because 42 C.F.R. § 405.1867 specifies that the Board must comply with such Rulings." *Id.* at 16. The Board then granted EJR "for the limited question of the validity of the provision of CMS Ruling CMS 1739-R." *Id.* Notwithstanding its conclusion that the plaintiff hospitals' appeals met the jurisdictional

requirements under the Medicare appeals regulation, 42 C.F.R. § 405.1835(a), the Board concluded, in the same letter, that the Ruling "confirms that the Board lacks substantive jurisdiction over the providers' Part C Days issue *as of August 17, 2020* (*i.e.*, the date CMS Ruling 1739-R was issued)." *Id.* at 14.  Accordingly, the Board's letter stated that it "must deny providers' EJR request[s] concerning the Medicare Part C Days issue."  *Id.*

49.     In another letter dated October 27, 2021, the Board found that the appeals for the plaintiff hospitals in Board cases 13-1937GC and 18-1406GC involve the Part C day DSH issue and concluded that, under the terms of the Ruling, "the Board must remand this issue to the Medicare Contractor for calculation of the DSH payment adjustment."  Exhibit B.  The letter further stated that the Board had "reviewed the jurisdictional documentation" for the plaintiff hospitals and found that they "met the jurisdictional and procedural requirements under 42 U.S.C. § 1395oo, 42 C.F.R. Part 405, Subpart R, and Board Rules for the Medicare Part C issue."  *Id.* Accordingly, the Board remanded the appeals, "clos[ing]" and "remov[ing] [them] from the Board's docket."  *Id.*

50.     By letter dated November 9, 2021, the Board found that the appeals for the plaintiff hospital in Board cases 21-0284GC and 21-0285GC were duplicative of appeals in an earlier Board case, 16-1623GC, and must, therefore, be dismissed.  *See* Exhibit C.  Without addressing the fact that the hospital in those cases indisputably met the statutory jurisdictional requirements under 42 U.S.C. §§ 1395oo(a)–(b) for its appeals, the Board instead concluded that Board cases 21-0284GC and 21-0285GC were "duplicative[] and must be dismissed"  because the Board "already [] granted EJR for the Part C days issue for this specific year in," and the same common owner of, the earlier group appeal.  Exhibit C at 1.  The Board's letter, however, does not address several critical facts. Board cases 21-0284GC and 21-0285GC contained only one hospital at the time the Board

dismissed them, Methodist Richardson Medical Center (Provider No. 45-0537). The earlier Board case, 16-1623GC, did not contain an appeal for Methodist Richardson, because at the time the hospital's original NPR was issued, Methodist Richardson did not meet the minimum statutory requirements to qualify for a Medicare DSH payment. *See* 42 U.S.C. § 1395ww(d)(5)(F)(v) (requiring a minimum fifteen percent disproportionate patient percentage in order to qualify for Medicare DSH). Because it did not qualify for a Medicare DSH payment, Methodist Richardson would not have benefitted from filing an appeal from its original NPR and being included in the earlier group appeal. It was not until nearly three years later, on May 28, 2020, long after the earlier group was considered fully-formed based on the facts at the time, that Methodist Richardson received a revised NPR providing the hospital with a Medicare DSH payment for the first time. Methodist Richardson then appealed that revised NPR to Board cases 21-0284GC and 21-0285GC.[4] The Board's decision, however, ignored these key facts explaining why Methodist Richardson was not included in the earlier appeal that the Board determined was duplicative.

51.     By the filing of this Complaint, the plaintiff hospitals have timely commenced this action for judicial review under 42 U.S.C. § 1395oo(f)(1).

## ASSIGNMENT OF ERRORS

52.     The Medicare statute provides for judicial review of the question presented here "pursuant to the applicable provisions under chapter 7 of title 5," *i.e.*, the APA. 42 U.S.C. § 1395oo(f)(l).

---

[4] These cases were filed as group appeals because Methodist Hospitals also intended to add Methodist Mansfield Medical Center (Provider No. 67-0023) to those group appeals. That hospital similarly did not qualify for a Medicare DSH payment in its original NPR when the earlier group was considered fully-formed and is expecting a revised NPR that would pay it a Medicare DSH payment for 2014 for the first time. But the Board dismissed the two cases before Methodist Mansfield could be added.

53.     The applicable provisions of the APA provide that the "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law; [or] (E) unsupported by substantial evidence[.]"  5 U.S.C. § 706(2).  In applying this standard, the determinations at issue should be found unlawful and set aside including for the reasons detailed below.

## Count I:  The Determinations as to Part C Days in the DSH Calculation Are Invalid and Should Be Set Aside

54.     The plaintiff hospitals repeat the allegations in paragraphs 1–53 of this Complaint as if fully set forth herein.

55.     The agency's calculations of the plaintiff hospitals' DSH payments are invalid, and should be set aside, because the agency's application of the Part C policy first published in the 2004 rule is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, in excess of statutory authority, without observance of procedure required by law, and unsupported by substantial evidence, including for (but not limited to) the reasons more specifically described below.

56.     The agency's DSH determinations are procedurally invalid under the Medicare Act, 42 U.S.C. § 1395hh.  The Medicare Act requires notice-and-comment rulemaking for a "rule," a "requirement" or a "statement of policy" that "establishes or changes a substantive legal standard governing . . . the payment for services."  42 U.S.C. § 1395hh(a)(2); *see Allina II*, 139 S. Ct. at 1810–14 (upholding the Court of Appeals' finding that agency "violated" the rulemaking provisions of the Medicare Act under 42 U.S.C. § 1395hh(a)(2) by failing to provide for notice and comment).

57.     Further, the Medicare Act provides that if a final rule is not a logical outgrowth of a proposed rule, then it "shall not take effect" until there is further opportunity for comment and publication again as a final rule.  42 U.S.C. § 1395hh(a)(4).  *See Allina II,* 863 F.3d at 945 (the agency violated 42 U.S.C. § 1395hh(a)(4) by not providing a "further opportunity for public comment and a publication of the [2004] provision again as a final regulation" before reimposing the 2004 rule vacated for a logical outgrowth failure).  This Court has already ruled, and the Court of Appeals has affirmed this Court's ruling, that the 2004 rule was not a logical outgrowth of the proposed rule.  *Allina I*, 746 F.3d at 1109.

58.     The DSH payment determinations at issue are also invalid under the APA's notice-and-comment rulemaking requirement.  Under established Court of Appeals precedent applying the APA, "[u]nless and until [an agency] amends or repeals a valid legislative rule or regulation, [the] agency is bound by such a rule or regulation."  *Am. Fed'n of Gov't Emps. v. Fed. Lab. Rels. Auth.*, 777 F.2d 751, 759 (D.C. Cir. 1985).  When a rule is vacated, that vacatur has the effect of reinstating the prior regulation.  *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019).  The pre-2004 regulation, which was restored by the Court's vacatur in *Allina I*, dictates the exclusion of Part C days from the number of Part-A-entitled days in the Medicare DSH calculation.  That pre-2004 regulation specifies that the Medicare Part A/SSI fraction includes only "covered" patient days, *see* 42 C.F.R. §§ 412.106(b)(2)(i) (2003), meaning days paid under Part A.  *Id.* § 409.3; *see also Catholic Health Initiatives*, 718 F.3d at 921 n.5.  Part C days are not covered by Part A because payment by private Part C Medicare Advantage plans for services furnished to their Part C patients is *not* payment by Part A.  *See* 42 U.S.C. § 1395w-21(a)(1); *Northeast Hosp.*, 657 F.3d at 6.  The agency cannot effectively amend the pre-2004 reinstated legislative rule except through notice-and-comment rulemaking.  What an agency does through

notice and comment can only be undone by notice and comment.  *See Nat'l Fam. Plan. & Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 241 (D.C. Cir. 1992) ("Once a regulation is adopted by notice-and-comment rulemaking . . . its text may be changed only in that fashion.") (quoting *Homemakers N. Shore, Inc. v. Bowen*, 832 F.2d 408, 413 (7th Cir. 1987) (Easterbrook, J.)).

59.     Further, the agency's continued application of the policy first adopted in 2004 in the payment determinations at issue here is arbitrary and capricious and a failure of reasoned decision-making.  *See Mirror Lake Vill., LLC v. Wolf*, 971 F.3d 373, 376 (D.C. Cir. 2020) (agency action is arbitrary and capricious if it is "not 'reasonably explained'" (citation omitted)).  The agency has never acknowledged that the policy adopted in the 2004 rule and applied here departed from the pre-existing rule and practice regarding the treatment of Part C days in the DSH payment and has not explained any good reason for that change.  *See FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009); *see also Dillmon v. Nat'l Transp. Safety Bd*., 588 F.3d 1085, 1089–90 (D.C. Cir. 2009) (agency must "acknowledge and provide an adequate explanation for its departure from established precedent").

60.     Likewise, the agency has never acknowledged the enormous adverse financial impact on hospitals of the 2004 policy change, nor has the agency ever explained why the policy change is appropriate despite that adverse impact on the nation's safety-net hospitals, like the plaintiff hospitals, that shoulder the financial burden of treating a disproportionate share of low-income patients.  *See Util. Solid Waste Activities Grp. v. EPA*, 901 F.3d 414, 430 (D.C. Cir. 2018) ("An agency's failure to consider an important aspect of the problem is one of the hallmarks of arbitrary and capricious reasoning."); *Bus. Roundtable v. S.E.C.*, 647 F.3d 1144, 1148–49 (D.C. Cir. 2011) (vacating a Securities and Exchange Commission rule as arbitrary and capricious because the agency had failed "adequately to assess the economic effects of a new rule" by, among

24

other things, "inconsistently and opportunistically fram[ing] the costs and benefits of the rule" and "fail[ing] adequately to quantify the certain costs or to explain why those costs could not be quantified").

61.     Finally, the agency's continued application of the 2004 policy is also arbitrary and capricious because the agency has failed to provide a rational explanation for its inconsistent interpretation of the same phrase "entitled to benefits" within a single sentence of the DSH statute. *See Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996) ("A long line of precedent has established that an agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently.").  With respect to the Part C days at issue here, the agency interprets "entitled to benefits" under Part A of Medicare to include all Medicare beneficiaries who have ever once met Medicare Part A eligibility requirements, regardless of whether they are entitled to payment of Part A benefits, while at the same time the agency construes that same phrase concerning SSI benefits to include only those days for patients who were entitled to have SSI benefits paid to them on those days.  *See* 78 Fed. Reg. at 50,617; *see also Baystate Med. Ctr. v. Leavitt*, 545 F. Supp. 2d 20, 26 n.12, 42 (D.D.C. 2008).

62.     The agency's policy treating Part C days as Part A days is also contrary to the intent of Congress in enacting the DSH statute and fails the reasonableness test under *Chevron* step two. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  The policy "conflict[s] with the policy judgments that undergird the statutory scheme," *Health Ins. Ass'n of Am., Inc. v. Shalala*, 23 F.3d 412, 416 (D.C. Cir. 1994), and is impermissible, *see Goldstein v. SEC*, 451 F.3d 873, 883 (D.C. Cir. 2006) (rejecting policy under *Chevron* step two where it was not "rational when viewed in light of the policy goals underlying the" applicable statute).

63.     The plaintiff hospitals further contend that the Part C days policy applied here is contrary to the plain language of the Medicare DSH statute.  *See* 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I)–(II).  Although the Court of Appeals in *Northeast Hospital* previously found that the phrase "entitled to benefits under part A" as used in the Medicare DSH statute does not require any specific treatment of part C days in the DSH calculation, 657 F.3d at 11, the Ninth Circuit recently found that this language means "that a patient has an 'absolute right . . . to payment,'" *Empire Health Found. for Valley Hosp. Med. Ctr. v. Azar*, 958 F.3d 873, 885 (9th Cir. 2020), *cert. granted sub nom. Becerra v. Empire Health Found.*, No. 20-1312, 2021 WL 2742788 (U.S. July 2, 2021) (citations omitted).  That view is consistent with the agency's pre-2004 regulation, which only included days that were "covered," *i.e.*, *paid*, by Medicare part A.  *See* 42 C.F.R. § 412.106(b)(2)(i) (2003); 42 C.F.R. § 409.3 (defining "covered" as services for which payment is authorized).  The Ninth Circuit rejected the government's request for rehearing in that case, and the Supreme Court granted the government's petition for certiorari.

## Count II: CMS Ruling 1739-R and Administrative Decisions Applying It Are Invalid and Should Be Set Aside

64.     The plaintiff hospitals repeat the allegations in paragraphs 1–53 of this Complaint as if fully set forth herein.

65.     The provisions of the Ruling depriving the Board of jurisdiction over otherwise jurisdictionally valid appeals, and declaring appeals moot and requiring the Board to remand them to the Medicare contractors are invalid and must be set aside as inconsistent with 5 U.S.C. § 706(2) and 42 U.S.C. §§ 1395oo(a), (f)(1), 1395hh(a)(2), and 1395hh(e).  For similar reasons, the administrative decisions applying the terms of the Ruling are also invalid and must be set aside.

66.     The provisions of the Ruling purporting to declare that the Board lacks jurisdiction over appeals of the Part C day DSH issue and the administrative decisions applying those

provisions violate the plain language of 42 U.S.C. § 1395oo.  Section 1395oo(a) grants the Board jurisdiction over each of the Part C day DSH appeals at issue here.  That provision also grants hospitals the right to a Board hearing when the hospitals are dissatisfied with the final determinations of the Medicare contractor as long as the minimum amount in controversy is met and the appeals are timely filed, as they were here.  42 U.S.C. § 1395oo(a)(1).  Nothing in section 1395oo or any other statute authorizes the agency to divest the hospitals of the appeal rights granted to them, or the Board of the jurisdiction conferred to it, by section 1395oo.  In addition to instructing the Board to dismiss the plaintiff hospitals' existing appeals, Ruling at 1–2, the Ruling would also potentially strip hospitals of the right to challenge future DSH payment determinations that the agency claims will be issued after adoption of the final rule.  If the agency's proposal is finalized, the plaintiff hospitals would not see any change in their DSH payments, because the agency's proposed policy was already applied in making hospitals' DSH payments (even though the rule imposing the same policy was previously vacated in *Allina I*, 746 F.3d at 1111).  Under the agency's own regulation, an appeal of a revised payment determination that does not actually make any revision to either of the DSH fractions or to the DSH payment amount could be challenged by the Medicare contractors or dismissed by the Board for lack of jurisdiction.  *See* 42 C.F.R. § 405.1889(b)(1) (providing that "[o]nly those matters that are specifically revised in a revised determination or decision" are appealable).  The agency's attempt to divest the Board of its statutorily granted authority via the Ruling violates the statute's grant of providers' substantive appeal rights under 42 U.S.C. § 1395oo(a) and is invalid.

67.     The application of the Ruling to the plaintiff hospitals' appeals also unlawfully violates 42 U.S.C. § 1395oo(f)(2), which requires the agency to pay interest to a hospital that prevails in an action for judicial review brought under section 1395oo(f).  Under the statute,

interest begins to accrue approximately six months after the final determination under appeal is issued.  42 U.S.C. § 1395oo(f)(2).  Many of the final determinations at issue here were issued many years ago, and the government might take the position that remand of hospitals' appeals under the Ruling would effectively reset the date from which interest would accrue, thereby depriving hospitals of years of interest to which they are otherwise entitled under the statute.  Assuming that the plaintiff hospitals are even able to appeal from the revised payment determinations that the agency claims will be issued following publication of the final rule, the government could take the position that interest on those new appeals would begin to accrue based upon the much later date of the revised determination, resulting in the potential forfeiture of years of statutory interest that had accrued during the prior appeal.

68.     By effectively negating the plaintiff hospitals' rights to challenge payment determinations and to recover interest, the administrative decisions applying the Ruling are final, reviewable decisions under 42 U.S.C. § 1395oo(f)(1).  *See Meredith v. Fed. Mine Safety & Health Rev. Comm'n*, 177 F.3d 1042, 1047 (D.C. Cir. 1999) ("[A]n order will be considered final to the extent that it '. . . denies a right[.]'" (citation omitted)).  They are also reviewable under 28 U.S.C. § 1331 as *ultra vires* agency action because they are based on the Ruling, which is patently invalid under the Medicare statute.   *See Amgen, Inc. v. Smith*, 357 F.3d 103, 113 (D.C. Cir. 2004) (explaining that "the court must address the merits to the extent necessary" where "the determination of whether the court has jurisdiction is intertwined with the question of whether the agency has authority for the challenged action"); *Fresno Cmty. Hosp. & Med. Ctr. v. Azar*, 370 F. Supp. 3d 139, 152 (D.D.C. 2019), *aff'd sub nom. Fresno Cmty. Hosp. & Med. Ctr. v. Cochran*, 987 F.3d 158 (D.C. Cir. 2021) ("An agency action is open to judicial review . . . when it 'patently

misconstrues a statute, disregards a specific and unambiguous statutory directive, or violates a specific command of a statute.'" (citation omitted)).

69.     The provisions of the Ruling declaring the plaintiff hospitals' claims moot, and the administrative decisions applying those provisions, are arbitrary, capricious, not based upon substantial evidence, and otherwise contrary to law.   Contrary to the agency's assertions in the Ruling, the issuance of the proposed rule has not rendered the plaintiff hospitals' appeals "moot" or eliminated "any actual case or controversy."   *See* Ruling at 8.   The agency's proposal to adopt retroactively the exact same policy on the treatment of Part C days as is challenged in these appeals, thereby including Part C days in the Medicare Part A/SSI fraction, where the plaintiff hospitals contend they should be *excluded*, and excluding Part C days from the Medicaid fraction, where the plaintiff hospitals contend Part C days should be *included*, cannot rationally be said to have rendered these appeals moot.   *See, e.g.*, *Tucson Med. Ctr. v. Sullivan,* 947 F.2d 971, 978 (D.C. Cir. 1991) (applying the rule that "as long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot") (quoting *Ellis v. Brotherhood of Ry., Airline & S.S. Clerks,* 466 U.S. 435, 442 (1984))); *Ramer v. Saxbe,* 522 F.2d 695, 704 (D.C. Cir. 1975) ("A case is not moot so long as any single claim for relief remains viable, whether that claim was the primary or secondary relief originally sought.").   The agency's suggestion to the contrary is absurd and cannot be used as an excuse to strip the Board of jurisdiction.   Thus, any determination that the claims are moot is not based on any evidence, let alone substantial evidence, and is arbitrary and capricious and conflicts with binding case precedents in this Circuit.   *See, e.g.*, *Tucson Med. Ctr.,* 947 F.2d at 978; *Ramer,* 522 F.2d at 704.

70.     The Ruling and any administrative decisions applying it further violate the special notice-and-comment rulemaking provision of the Medicare Act.   42 U.S.C. § 1395hh(a)(2).   This

provision prohibits a "rule, requirement, or other statement of policy . . . that establishes or changes a substantive legal standard" governing the payment for services from "tak[ing] effect unless it is promulgated" through notice-and-comment rulemaking.  *Id*.  In *Allina II*, the Supreme Court held that the agency's attempted re-adoption of the 2004 policy change was at least a statement of policy governing payment for services, and therefore was required to undergo notice-and-comment rulemaking before it could take effect.  *Allina II*, 139 S. Ct. at 1810–14.  The Ruling did not undergo notice-and-comment rulemaking before becoming effective.  If the agency's attempt to apply the vacated 2004 policy was required to undergo notice-and-comment rulemaking, then certainly the attempt to deny hospitals the ability to even challenge these invalid payment determinations, as the Ruling purports to do, similarly violates the requirements of section 1395hh(a)(2).  This is exactly the type of agency action the Medicare Act's special requirements seek to prevent.  *See Allina II*, 139 S. Ct. at 1808 ("As Medicare has grown, so has Congress's interest in ensuring that the public has a chance to be heard before changes are made to its administration.").  By failing to give regulated parties notice and the ability to comment on the Ruling, the agency has again violated the terms of section 1395hh(a)(2), as interpreted by the Supreme Court in *Allina II*.

71.    The application of the Ruling is also impermissibly retroactive as applied to the cost years at issue here.  *See* 42 U.S.C. § 1395hh(e).  Section 1395hh(e) prohibits the agency from retroactively effectuating rules or policies adopting new substantive standards unless one of two very narrow exceptions are met, namely, when "such retroactive application is necessary to comply with statutory requirements," *id.* § 1395hh(e)(1)(A)(i), or where the "failure to apply the change retroactively would be contrary to the public interest," *id.* § 1395hh(e)(1)(A)(ii); *see Northeast Hosp*., 657 F.3d at 13–17 (prohibiting the agency from retroactively applying the 2004 rule requiring the inclusion of Medicare Part C days in the Medicare Part A/SSI fraction to periods

beginning prior to the October 1, 2004 effective date of that rule); *see also Bowen*, 488 U.S. 204. Neither of these limited exceptions applies here, because 1) the Court of Appeals has expressly found that the DSH statute does not require any specific treatment of Part C days in the DSH calculation, *see Allina I*, 746 F.3d at 1106, and 2) the proposed policy cannot be said to be in the public interest as it would deprive safety net hospitals of significant DSH funding to which they are lawfully entitled.  Insofar as the Ruling would retroactively set in stone invalid DSH payment determinations in NPRs reflecting the same DSH Part C policy as reflected in the agency publications vacated in *Allina I* and *Allina II*, the Ruling would violate section 1395hh(e)(1) by retroactively changing the standard for treatment of Part C days in the DSH calculation.  As explained by the Supreme Court and the Court of Appeals in *Allina II*, the agency may not undertake this policy change (first attempted in 2004 and attempted again in 2014 for 2012 Medicare Part A/SSI fractions) without first promulgating a regulation.  *Allina II*, 139 S. Ct. at 1817; 863 F.3d at 933–34.

72.     While the Ruling explains that there have been frequent requests for EJR on the Part C day DSH issue, Ruling at 6, the Ruling nowhere directs the Board not to rule on EJR requests or to reject these requests solely on the basis of jurisdiction.  The Board's action in this case is inconsistent with the Ruling itself and for that separate reason invalid.

## Count III: The Board's Dismissal of Appeals for Two Cost Years Is Invalid and Should Be Set Aside

73.     The plaintiff hospitals repeat the allegations in paragraphs 1–53 of this Complaint as if fully set forth herein.

74.     The Board's decision dismissing Board cases 21-0284GC and 21-0285GC is invalid and should be set aside because it is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, in excess of statutory jurisdiction, authority, or limitations, or short of

statutory right, without observance of procedure required by law, and unsupported by substantial evidence, including for (but not limited to) the reasons more specifically described below.

75.     The Board's dismissal is invalid because it conflicts with the plain language of the appeals statute.  The Medicare statute provides, in pertinent part, that "[a]ny appeal to the Board or action for judicial review by providers which are under common ownership or control . . . must be brought by such providers as a group with respect to any matter involving an issue common to such providers."  42 U.S.C. § 1395oo(f)(1).  The statute does not require that providers operating under common ownership or control pursue a particular issue for a particular fiscal year in the *same, one* group appeal.  To the extent that the regulation requires a single "group appeal,"  42 C.F.R. § 405.1837(b)(1), and that "absent an order from the Board . . . , no other provider under common ownership or control may appeal to the Board the issue that is the subject of the group appeal with respect to a cost reporting period that falls *within the calendar year(s)* covered by the group appeal," *id.* § 405.1837(e)(1) (emphasis added), the regulation is contrary to the statute and exceeds statutory authority.  Here, the Board relied on this invalid regulation to improperly dismiss Board cases 21-0284GC and 21-0285GC as duplicative of an earlier Board case, 16-1623GC, involving "the same common ownership, for the same issue (Part C Days), and *for the same year*,"  Exhibit C at 3 (emphasis added), even though those two group appeals were composed of different hospitals.  The Medicare statute imposes no such requirement, and the Board's dismissal of Board cases 21-0284GC and 21-0285GC is invalid.

76.     The Board's dismissal is also contrary to the appeals statute because it improperly denies the only plaintiff hospital that was part of Board cases 21-0284GC and 21-0285GC at the time of the Board's dismissal—Methodist Richardson (Provider No. 45-0537)—its statutory right to appeal an adverse contractor determination.  The Medicare statute specifically states that "[a]ny

provider of services . . . may obtain a hearing" before the Board if three statutory requirements are met: (1) the provider is dissatisfied with the Medicare contractor's final payment determination; (2) the amount in controversy is at least $10,000 (or $50,000 for a group appeal); and (3) the provider files a request for a hearing within 180 days after notice of the final payment determination.  42 U.S.C. §§ 1395oo(a)(1)–(3), (b).  Here, Methodist Richardson plainly satisfied all three requirements in both Board cases.  Accordingly, the Board's denial of Methodist Richardson's right to appeal is invalid and must be set aside.

77.      In addition, the Board's dismissal is arbitrary and capricious because the Board failed to consider an important factor.  Here, the plaintiff hospital, Methodist Richardson (Provider No. 45-0537), did not qualify for a Medicare DSH payment until it received the revised NPR that is under appeal in Board cases 21-0284GC and 21-0285GC.  At the time that the earlier group (Board case 16-1623GC) was declared complete (July 28, 2017), Methodist Richardson did not qualify for a DSH payment, would not have benefited from an appeal, and, therefore, did not appeal from its original NPR.  Indeed, any such earlier appeal would potentially have been subject to a jurisdictional challenge by the Medicare contractor.  Methodist Richardson later received a revised NPR from the contractor on May 28, 2020, which paid the plaintiff hospital a Medicare DSH payment for the first time, and the plaintiff hospital, in turn, sought to appeal that NPR to the Board.  Methodist Richardson should not be denied its statutory right to appeal from a determination with which it is dissatisfied, 42 U.S.C. §§ 1395oo(a)–(b), based solely on the Board's overly rigid application of a regulation that itself violates the Medicare appeals statute. The Board's dismissal is, therefore, arbitrary and cannot stand.  *See Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) ("[A]n agency rule would be arbitrary and capricious if the agency . . . entirely failed to consider an important aspect of the

problem[.]"); *see also Farmers Union Cent. Exch., Inc. v. F.E.R.C.*, 734 F.2d 1486, 1511 (D.C. Cir. 1984) ("It is well established that an agency has a duty to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives."); *Shieldalloy Metallurgical Corp. v. Nuclear Regul. Comm'n*, 624 F.3d 489, 493 (D.C. Cir. 2010) ("[A]gencies must evaluate parties' proposals of 'significant and viable' alternatives." (quoting *id.* at 1511 n.54)).

**REQUEST FOR RELIEF**

78. The plaintiff hospitals request an Order:

a.      declaring invalid and setting aside the final payment determinations reflecting the policy of including Part C days in the Medicare Part A/SSI fraction and excluding Medicaid-eligible Part C patient days from the numerator of the Medicaid fraction used to calculate the plaintiff hospitals' Medicare DSH calculations for the cost reporting periods at issue;

b.      declaring invalid and setting aside the Medicare Part A/SSI fractions issued by the agency and applied in the final payment determinations at issue here;

c.      declaring invalid and setting aside CMS Ruling 1739-R and declaring invalid and setting aside any administrative decisions applying that Ruling;

d.      declaring invalid and setting aside the Board's decision dismissing Board cases 21-0284GC and 21-0285GC;

e.      directing the agency to recalculate the plaintiff hospitals' DSH payments consistent with that Order and to make prompt payment of any additional amounts due the plaintiff hospitals, plus interest calculated in accordance with 42 U.S.C. § 1395oo(f)(2);

f.       requiring the agency to pay legal fees and cost of suit incurred by the plaintiff hospitals; and

g.      providing such other relief as the Court may consider appropriate.

Respectfully Submitted,


/s/ *Stephanie A. Webster*
Stephanie A. Webster
   D.C. Bar No. 479524
J. Harold Richards
   D.C. Bar No. 469524
Alex J. Talley
   D.C. Bar No. 1020488
ROPES & GRAY LLP
2099 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Phone: (202) 508-4859
stephanie.webster@ropesgray.com

Counsel for Plaintiffs

Dated:  December 15, 2021